This is the case of People v. Antoine McNutt. It's 1-17-3030. Before you, you have the 1st District 2nd Division Appellate Court, which consists of Aurelia Paczynski, Cynthia Cobb, and myself, Justice James Fitzgerald Smith. Our procedure is as follows. First, the appellant will get the opportunity to present their case without us interfering or letting you complete your whole presentation. Then we will ask questions. Then the appellee will have their opportunity to present their case and no interference. And then at the end of that, the appellant will close. If you're ready, we may as well proceed. All right. Good morning, Your Honor. Attorney, I'm Sean Colin Stapleton from the Office of the State Appellate Defender, representing Antoine McNutt. He raised two issues in his brief. They are interrelated and I will discuss them simultaneously. Those being the trial court shouldn't have accepted his waiver of counsel because the waiver was not voluntary and intelligently made and that there was a bona fide doubt of his fitness to represent himself throughout the proceedings. Now, this court's review of these claims depends on a complete record of Mr. McNutt's in-court conduct from the pretrial stage throughout the trial. Also, I want to point out that courts should presume that defendants, I'm sorry, they should indulge in every reasonable presumption against a defendant's waiver of counsel. With those in mind, I want to take this court to the arraignment in this case where Mr. McNutt first requested to represent himself. In that case, his conduct was so disruptive, I'm sorry, on that date, his conduct was so disruptive with him asserting his right to self-representation and his obsession with the speedy trial that the court stated that he was being irrational in order to fitness examination. Now, even though he was expressing his interest in representing himself, the court critically did not order an exam for his ability to represent himself and that caused problems throughout the proceedings. On the next court date, the judge tried to admonish him again pursuant to 401 and she got through the admonishments, but his conduct was largely unchanged. He continued to be disruptive and he, for the first time, espoused some bizarre thoughts about the criminal justice system. Specifically, he said that his prosecution was improper because he had not yet received a letter of nobility from the state's attorney. Despite these outbursts, the court allowed the public defender to withdraw and McNutt was on his own. His bizarre and disruptive conduct continued throughout the pretrial proceedings. He again requested this letter of nobility from the state's attorney. He suggested that he had a contract with the state's attorney that prevented his prosecution. He said that there was a fraudulent admiralty jurisdiction at work that should have prevented his prosecution. And then again, he remained obsessed with his right to a speedy trial. Furthermore, he alarmingly refused to accept or review discovery. Which obviously prevented him from adequately preparing for the trial. So then we get to the first day of the trial. Despite all of this alarming conduct. And the court again admonishes him pursuant to Supreme Court Rule 401. And again, there's more of this disruptive conduct. And when she finally finishes the admonishments, Mr. McNutt tells her that he will have to agree to disagree about the waiver. More alarming still is that the 402 admonishments, 401 admonishments came before the doctor from Friendship Clinical Services testified about his fitness. Furthermore, the doctor never testified or gave an opinion about his fitness to represent himself. Which was obviously the issue at hand. Then we move forward to the trial. And it's clear that it was a bona fide doubt of his fitness to represent himself. His opening statements were met with a blizzard of objections from the state and from the court. Even though he had been instructed by the court how he should conduct himself, he was unable to do so. His cross-examination of five civilian witnesses, three law enforcement witnesses, two expert witnesses, and the assistant medical examiner. His cross-examinations were largely irrelevant and failed to subject the state's case to any meaningful adversarial testing. By the time we get to his trial testimony, again, the trial court informed him of the difference between argument and testimony. And yet, during his testimony, he was largely unable to confine himself to just argument. He again brought up some of these more bizarre notions about the justice system. Well, he talked about his speedy trial, he talked about admirably jurisdiction, he talked about no-knock warrants, all of which were irrelevant to this case. His testimony ended with him and the trial court fighting over the differences between permissible testimony and improper argument. And he finally just gave up and said, I'll just wait till the argument. And when the argument came, his closing argument, again, was met with dozens of objections from the state and the court. He also returned to his themes of a fraudulent, admirably jurisdiction from Washington, D.C., prevented his prosecution. The prosecutors didn't have licenses to practice law. He even asked the jurors if any of them read poetry. Then, for the state's rebuttal, he repeatedly interrupted the state during rebuttal with irrelevant objections. All of this culminated after a three-day jury trial, with the jury taking only 20 minutes to find him guilty, which I think shows that there was a complete breakdown in the adversarial process here. There was a bona fide doubt of his fitness to represent himself. And for those reasons, Your Honors, because there was not a knowing and intelligent waiver of his right to counsel, and because there was a bona fide doubt of his fitness to represent himself, this court should reverse his convictions and remand for a new trial. Questions? I have one. You just stated that there was a bona fide doubt of his fitness to self-represent. From what conclusion, from what do you draw that conclusion? His conduct throughout the proceedings. Just his conduct. Well, you used bona fide, which kind of suggests that there had been some other kind of medical finding, which is why I asked. I just want to make clear, from Indiana v. Edwards, they lay out three different standards. There's the standard for fitness to go to trial with the assistance of counsel. The fitness to waive counsel and just plead guilty. And then the highest standard, of course, is fitness to represent yourself, because that, of course, is the most complex action. And when you have a defendant like Mr. McNutt with an uncertain mental state, you should be very, very careful, of course, be very careful about allowing him or defendants like him to represent themselves, because, of course, you have what happened here. The trial devolved into a spectacle, frankly, of Mr. McNutt being unable to represent himself effectively. And we had what we had, 20 minutes of deliberations at a three-day murder trial. Weren't there several, though, witnesses who testified that they actually saw the offense as it was occurring? So earlier you stated that the fact that there had been a conviction supported the conclusion that the adversarial proceeding had broken down. But there were several eyewitnesses to this crime. Absolutely, Your Honor. But there was never a lawyer who went over all the discovery. There was no one who went over all the discovery. There was no one who ever considered all of his options for defense. The public defender withdrew well before the discovery was complete. The witnesses didn't see what happened immediately before the attack. There could have been avenues uncovered that would have been helpful to Mr. McNutt. We simply don't know because... There was no reason for the assistant public defender to argue for a lesser charge. That wouldn't have happened during the course of trial. Certainly not. But even if they went to trial, I don't know what the discovery is. And no one really does, except the state does, of course. But no one with Mr. McNutt's best interest at heart, and who I believe was capable of representing him, has ever seen the discovery. And thus, we simply don't know what options could have been raised during plea negotiations or at trial. Well, wouldn't that be the case for any high school educated, self-represented litigant? Wouldn't necessarily be the case that they have a mental incapacity. Generally, someone who doesn't have legal training might not understand the particulars related to proceeding in trial. Wouldn't that be the case, regardless of a mental incapacity? That's absolutely true, Your Honor. I'm not suggesting that the outburst would be the same. You might not get the questions about admiralty and letters of nobility. But with someone who doesn't have the legal training, wouldn't you nonetheless get the same level of representation, which is generally very limited? Well, I think someone who didn't have Mr. McNutt's difficulty conforming himself to the rules of the courtroom would have done better. And again, Indiana v. Edwards concerns someone with an uncertain mental state. It's clear the court had concerns about Mr. McNutt's mental state because she ordered a fitness exam and said he was being irrational. And I think his conduct throughout these proceedings should have raised very serious concerns with the court. And in fact, the way the court handled this case, I actually wonder if the court even understood that the court had the option of refusing him his right to represent himself. Because it seemed to me, bringing this case, the court just kind of assumed I just have to admonish him. If I get through the admonishments of Rule 401, that's all I can do here. Well, that's not really fair, is it? I mean, didn't the trial judge admonish him yet? I don't know, a second, maybe even a third time before they even proceeded to trial? It sounds to me from my review of the record that the trial judge was really being quite deliberate in trying to ascertain whether or not to allow this defendant to self-represent. You don't usually have the case where you're just on the precipice, just at the brink of going to trial and the trial judge goes all the way back to say, well, wait a minute, let's do 401 yet again. I just think it's a little bit of an unfair characterization. I'm sorry. Well, when the court admonished him again, right before the fitness testimony from the judge, the forensic clinical services psychiatrist, the judge equated his ability to represent himself with just the fitness to stand trial standard. The judge didn't seem to understand under Indiana versus Edwards, there was a different standard here at play. And there was never, again, the judge never requested and never even mentioned this higher standard. And the judge seemed to think, again, that if we get to the 401 admonishments, that's all I can do for this person. I'm not sure the judge even really understood, again, that under Edwards versus Indiana, she had the right to decline his right to represent himself. I think the record could go either way on that. But the fact that it could go either way of that, I think should be very concerning to this court. Thank you, Mr. Stapleton. Thank you, Justice Smith. I have no further questions. I have some. Okay, so the first time the judge talked, there was any discussion about him representing himself, he said, I don't want to do that because I'd be admitting my guilt. The judge ordered a fitness exam. When the judge had the fitness exam on record, she went through a pretty exhaustive, I think, series of questions with him about whether or not he should be allowed to waive counsel. And his answers were pretty much okay. They didn't indicate that he didn't understand. They indicated that he understood what was going on, that he had some level of understanding about what she was asking him. He didn't agree with the trial. He didn't agree with the charges. But it was pretty clear from all of the questions that she asked him at that point that he really wanted to defend himself and that he understood the charges, that he understood what would happen if he lost, that he understood that it was a bad idea, she told him. So, I don't know what more this judge could have done. Now, you're saying, in the middle, after the trial started, and he became what you've characterized as bizarre, that she should have said, hold the fort. We're going to have to do this. We're going to have to question whether or not he's competent to waive counsel now at this point in the middle of the trial. That's what you're asking us to do? No, I'm saying, just to be clear, I'm saying that his conduct from the arraignment forward raised a bona fide doubt of his fitness to represent himself. And his conduct throughout the pretrial proceedings was extraordinarily alarming. His conduct during the trial was extremely alarming. You're right, Your Honor, that he got through the 401 admonishments on the day of the trial without the usual interruptions. He also said at the end of those admonishments, we'll agree to disagree. I mean, again, the court should look to the entire record for determining whether this waiver was proper. It should also look to the entire record to determine if there was a bona fide doubt. And it's my contention, this record as a whole, shows extremely alarming conduct on his behalf. That should have, again, should have prevented the court from allowing him to represent himself and raised a bona fide doubt of his fitness to represent himself. The court could not be his lawyer. The court could not stop the music and say, wait a minute, Mr. McNutt, you're not asking for this discovery. Do you really think that's a good idea? I mean, she could not become his lawyer. He got through all the admonitions. He got through them well enough that I think any one of us would have said, yep, that's an effective admonition, that's an effective knowing and intelligent waiver of counsel. He gets into the trial, he starts acting like he doesn't know what he's doing, which would be expected for someone who's representing himself in a murder case, and starts acting on points of law that don't have anything to do with the case, which would also be expected for someone with no legal training. And what you're asking us to do is say, well, the judge should have been his advocate at that point and stop the music and say, okay, wait, we've got to rewind this now. We've got to rewind everything and make a different decision. And I don't know, I don't know how this judge could have done that. The judge doesn't have to be his advocate, but the judge does have to ensure the integrity of the proceedings. And it was not just his conduct during the trial, Your Honor, it was alarming. His conduct in the arraignment was alarming. His conduct throughout the pretrial proceedings was very alarming. And again, the low star here, the north star here, is whether or not a defendant's uncertain mental state is going to jeopardize the fair trial. Okay. We've got an evaluation that says he's fit to stand trial. You're saying that's different than an evaluation to represent himself. Okay, fine, we can deal with that. So he's fit to stand trial. And then he answers appropriately, if a little self-servingly, the answers during the admonitions on whether or not he can waive counsel. And I mean, I can't think of one more question this judge could have asked this man or one more thing she could have said to him to make sure he understood this is a bad idea. And she didn't let the PD withdraw until after those admonitions. You made it sound in your opening like she let the PD go right after the fitness exam. She didn't do that. She gave him another full set of admonitions to which he answered appropriately for his level of education and the fact that he didn't want to be on trial and he was mad at the system for arresting him. And he didn't like the charges. Well, you'd expect that from a defendant in a murder trial. But other than that, I can't think of anything more she could have done to make sure that he was fit to represent himself. Now, during the trial when he started to act in your word, bizarrely, I think, you know, we've all seen, we've all seen clients, defendants who are represented by counsel acting out in court. Oh, I don't know what more this judge could have done. against the waiver of counsel. And the court did not do that. In this case, and again, we have a whole we have months of pretrial dates that showed again and again, that Mr. McNutt was an uncertain mental state that certainly, certainly called into question his ability to meaningfully represent himself. Anything further? Christine. Yes, Justice. May it please the court counsel Christine cook on behalf of the people. This record shows that the trial court in this case, properly provided this defendant with his constitutional right to self representation. This record is also abundantly clear that this defendant properly exercise his constitutional right to a speedy trial. The defendant in this case was tried seven months after his arrest for a murder case involving DNA evidence, which I'm sure this court can appreciate is unheard of in Cook County for any kind of case, much less a murder case. I take issue with the fact that defense counsel in this case asked this court to set aside and indulge against any presumption of fitness when the legal presumption is always to presume fitness unless there is any evidence otherwise. And in this case, the record affirmatively shows that the defendant was fit. Not only do we have an actual finding of fitness, which according to Illinois Supreme Court rule 401A and people Mahaffey satisfies the same issue of waiving counsel. But defense counsel in this case also claims that there's a higher standard in Illinois or in Indiana versus Edwards and that's not true. This is not a gray area defendant. This defendant has no mental problems as was found by Dr. Echevarria. To deny the defendant his constitutional right to represent himself in this case with those findings and this record would be reversible error. Defendant was fit for trial as was found by Dr. Echevarria. There is no higher standard. It is also notable that the only issue before this court today is the trial courts finding that this defendant was fit to proceed pro se. There's nothing that the defense counselor suggests that could have been done, should have been done, or should not have been done by the defendant. The defendant clearly fulfilled his role as an attorney and the test is that he performed all the necessary tasks as an attorney would do. There are so many issues here regarding this. He filed a motion to dismiss because he wasn't brought to preliminary hearing on time. Legal ignorance is wholly distinct from unfitness and that is exactly what defendant is trying to do in this case. They selectively cherry pick various select words in order to claim this defendant was unfit. But if this court looks at the whole record and the proceedings in this case, it becomes quite clear that the defendant had a very cogent and rational theory from all of his pre-trial motions through trial and post-trial motions. He repeatedly insisted of a speedy trial discharge. He understood the consequences of by-agreement dates and even asked the trial judge to void out the PD's by-agreement four-week continuance that he claimed was not done with his permission. He repeatedly requested orders for the law library access. He filed an SHSOJ motion. He reviewed the videos with the state and at one point he refused to view any more because they were repetitive, not because he wasn't reviewing the discovery as is improperly suggested today. The defendant wanted to change his plea to a no contest until he received all the discovery and while he did make claims about UCC remedies and admiralty jurisdiction, that, as Justice Puchinsky pointed out, is more of legal ignorance and has nothing to do with competency. The defendant noted that his name was misspelled. He made an oral motion to suppress and squash a rasp and then decided to forego that because he wanted to exercise his constitutional right to a speedy trial. He objected to the bugle swab. He identified two witnesses and said he was going to try to call them to testify. He made additional speedy trial demands and law library access and the judge repeatedly signed orders allowing him that access. He objected to the state's DNA consumption order. He refused to sign for more discovery feeling that that was some type of an admission. Again, these are not bizarre claims. These are not incompetency suggestions, but what it shows is legal procedural and substantive ignorance. He made a motion to suppress based on a violation of the knock-and-announce rule. He said that the discovery showed that witnesses were making inconsistent statements and impeached those witnesses at trial in that regard. He wanted all the evidence suppressed because there was no arrest warrant despite the fact that there was. Again, that is legal ignorance, not incompetence. Again, he asked for a speedy trial. He resolved his SOJ motion. He then filed a motion to suppress evidence about being recorded without his permission, claiming that he should have been told that in accordance with his Miranda rights. He filed a motion to suppress for faulty evidence, claiming that the video the state was about to play at trial was off of the internet. He filed a petition for release that the evidence had nothing to do with him. He objected to photos that were unclear that he couldn't identify. And then he claimed that, again, his indictment was misspelled, only two signatures wrong when there should have been eight. Again, legal ignorance, not incompetence. He's challenging everything the state is presenting, and this is well before trial. When he was readmonished, the record, as Justice Puchinsky shows, these admonishments, not just one, not just really two, but throughout the proceedings, are in fact exhaustive. The trial judge in this case went beyond the admonishments that were required. Then the defendant filed more motions on the date of trial. He said he understood the state's limiting motion regarding punishment and obeyed that. He objected to the state's motion to admit other crimes. He objected to the state's tendering more discovery. He decided to stay in his prison guard so the jury could see how the state treated him. He identified Serena Wood as his witness. And then when the judge understood or explained the litigation procedure, he said he understood. There's no question at the arraignment that this defendant in this case was very agitated, but he had also been in custody since February. And in his mind, and properly so, he should have been subjected to a speedy trial by that point. Because the judge ordered the BCX, this shows, as Justice Puchinsky shows out, a very careful and deliberated attempts to make sure that this defendant was not only just fit for trial, which he was, but that he was in fact fit to waive his constitutional attorney and exercise his constitutional right. A defendant made a cogent opening statement. He claimed he was somewhere else, that the evidence was falsified, and his constitutional rights were violated. And throughout the questioning of different witnesses in that case, all of those themes not only were hit, but were actually consistent with all of his claims from the beginning through the end. He cross-examined witnesses and challenged evidence. He impeached the victim's mother regarding her testimony about whether or not he had ever driven a van to pick up her son. He challenged Christopher Harris, who testified, who was a witness, that the photos in this case were photobombed. He objected to Harris testifying to videos. And then he attempted to impeach Mr. Harris regarding clothing identification of the offender on the video. And he asked Mr. Harris if he was being bribed. He objected to the video publication of Erwin Johnson, the store clerk, where video evidence was being admitted through his testimony. He objected to the exhibit publication with Officer Cuevarris. And then with Saritha Woods, who was a really important witness for him, he not only objected properly so to some of the leading of the state's case, but on cross, he elicited that she never noticed ill behavior of him. He showed her how to manipulate things on photos and cameras, and she never saw him drive, thus perfecting the impeachment of the victim's mother. He again made another speedy trial inquiry, a DNA inquiry, asked how the state could show videos of him. And then Victor Hicks, another eyewitness, the defendant cross-examined him about whether or not the police had ever offered him anything for his testimony, and whether or not the owner of the telephone that was left at the scene had in fact called him, suggesting that the phone left at the crime scene did not belong to the defendant, but to the real killer. There was no cross of any of the witnesses regarding DNA, the buccal swab, the medical examiner was not cross-examined, because the defense in this case was that he was at work in Wisconsin, and that wasn't him. That is a completely legitimate, reasonable doubt, alibi defense in this case. He never once was disruptive during the trial. Despite defense counsel's attempt to paint this as a really disruptive defendant, this record shows quite the opposite. He was completely in line with all of the procedure, and while there were certainly objections during his cross, or during his testimony, because he was doing a narrative, again, that was not disruptive, it was not bizarre. At best, it showed, as Judge Justice Cobbs noted, legal ignorance, as opposed to unfitness. He cross-examined all of the witnesses, he argued about his defense was that he had evidence when he was arrested that would satisfy his alibi defense, that this property was destroyed, and in fact, it was. He argued that the film did not show the face of the offender, that it wasn't his DNA on the bottle, or his fingerprints on the bottle, and that if that was in fact the murder weapon, which the record shows that it was, that it shows that there was another offender. The DNA and the fingerprints, he argued, and properly so, exonerated him. He also claimed that his property had been destroyed, which it was, which would have established his alibi. He, again, argued that he had been arrested without a warrant, held against his will. A speedy trial was denied. He went through jury instructions, and in fact, objected to three of the state's jury instructions, specifically 1.02, 2.01, and 2.01. The trial judge repeatedly asked the defendant if he wanted second-degree murder or self-defense murder instructions. And again, consistent with everything from the beginning to the end, the defendant said, no, my theory is that I wasn't there. He's looking for a complete, not guilty, not a compromised verdict. And again, his closing arguments are wholly consistent with everything he had been claiming from arraignment all the way through the motion for a new trial. The video shows someone else. My prints and my DNA are not on the evidence. I'm sorry, I will. His closing argument was wholly consistent with everything that he had always properly maintained, and logically and legally so. The whole point of a trial is to determine whether or not there was a fair trial. And in this case, there is no question that a fair trial was denied. There were eyewitnesses who knew the defendant and identified him and identified him being on the video. His cell phone was recovered at the scene. There is no question that the defendant's conviction was inevitable. And the fact that he put up such a cogent and coherent fight is only testament to the fact that this trial court should affirm the lower court's decision to allow this defendant to exercise his constitutional right to self-representation. There is no evidence that this was a gray-area defendant. And accordingly, the people respectfully request that this court affirm. Any questions? I would just like to give Ms. Cook an opportunity to correct a statement that she made. You said there's no question that a fair trial was denied. I mean, he was not denied a fair trial. I'm sorry, I misspoke. Thank you. I want to make sure that's in there. Sorry. Any questions? I have none. I have none. Jean, you may respond. The whole reason that the United States Supreme Court decided Edwards v. Indiana was to create a new standard for defendants with uncertain mental problems when they seek to represent themselves. That's the whole point of Indiana v. Edwards. And there is a higher standard than just a request to simply represent yourself. And I think that the state's suggestion that Mr. McNutt had no evidence of mental problems is amply rebutted by his performance throughout the pretrial and trial proceedings. And frankly, again, the fact that the trial court did not order an examination for his fitness to represent himself should be very concerning to this court. And it calls into question whether the court even understood the procedure of Indiana v. Edwards. I ask the court to reverse Mr. McNutt's conviction to remand for new trial. All right. Thank you both. You both overly ably argued your cases. You both went through everything procedurally. It was very well done, and we appreciate that. We'll let you know the results as soon as possible. Again, thank you. Stay safe.